UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
WILLIAM STEWART,                               :
                Plaintiff,       :
                                               :     **MEMORANDUM AND ORDER**
      -against-                                :     10-CV-3032 (DLI)
                                               :
MICHAEL J. ASTRUE,                             :
Commissioner of Social Security,               :
                                               :
                Defendant.       :
----------------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge:**

Plaintiff William Stewart filed an application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act (the "Act") on June 15, 2007. (Compl. at ¶ 7.) By a decision dated August 4, 2009, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act. (*Id.* at ¶¶ 10, 11.) On April 28, 2010, the ALJ's decision became the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review. (*Id.* at ¶ 12.) Plaintiff then filed the instant action seeking reversal of the Commissioner's decision. (*Id.* at 1, 4.) The Commissioner now moves for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), seeking affirmation of the denial of benefits because Plaintiff is not entitled to DIB and SSI under the Act since he was not disabled prior to December 31, 2005, the date Plaintiff's insured status expired. Plaintiff cross-moves for judgment on the pleadings, seeking reversal of the Commissioner's decision and remand of this action for additional proceedings. For the reasons set forth below, the Commissioner's motion is denied, plaintiff's motion is granted and the matter is remanded for further proceedings consistent with this opinion.

**BACKGROUND**

I.  **Non-medical and Testimonial Evidence**

   A.  *Hearing Testimony, dated 04/14/2009*

Plaintiff testified that he started a photocopy shop with a business partner in 1989, (Administrative Record ("A.R.") at 31-32, 101); however, since the events of September 11, 2001, he was no longer able to work because he had difficulty concentrating, (*id.* at 35). Moreover, Plaintiff stated that, after September 11, 2011, he began drinking heavily every day because of the stress. (*Id.* at 38.) At the time of the hearing, he asserted that he drank a beer once in a while, but that his drinking did not impact the business. (*Id.* at 37, 41.) Plaintiff also stated that he began treatment for depression and anxiety in October of 2003, and his business partner handled much of the work at the copy center thereafter. (*Id.* at 36, 40.) Plaintiff stated he was forced to close the business in May 2005 because, due to the events of September 11, 2011, there were no longer enough customers to sustain its operation. (*Id.* at 34, 109.) Unable to pay his rent, Plaintiff lost his apartment and was forced to live with his mother. (*Id.* at 29, 91.)

   B.  *Function report, dated 06/04-2007*

In a function report completed on April 3, 2007, Plaintiff complained that he was no longer capable of concentrating, motivating himself or remembering things. (A.R. at 90.) He needed reminders from his mother to take his medication and, although Plaintiff went grocery shopping once or twice a month, his mother and sisters prepared his food. (*Id.* at 29-30, 90-91, 93.) Plaintiff reported that he wanted to be left alone and did not do much at all. (*Id.* at 94.)

II.  **Psychiatric/Medical Evidence**

Plaintiff sought various psychiatric and medical treatments from 2003 to 2009. At the Jewish Board of Children and Family Services ("JBFCS"), Plaintiff was evaluated by several

psychiatrists, including Dr. Michael Merkin, Dr. Zinaida Luft, Dr. Jesse M. Hilsen, Dr. Richard Arking and Dr. Sander Koyfman. Plaintiff also received medical treatment from his primary care physician, Dr. Sultan Khan.

### A. *Evidence Prior to Plaintiff's Alleged Onset Date of May 25, 2005*

On October 16, 2003, Plaintiff sought psychiatric treatment at JBFCS, where he was evaluated by Dr. Merkin. (A.R. at 141-64.) Plaintiff reported that, since September 11, 2001, everyday life had become a real struggle for him. (*Id.* at 141.) Dr. Merkin found that Plaintiff had a life-long history of depression, which was untreated except for a brief trial of Zoloft four years prior, with minimal effects. (*Id.* at 163.) Dr. Merkin noted that by witnessing the Twin Towers coming down on September 11, 2001 and subsequently losing his business, Plaintiff's depression had "deepened." (*Id.*) Plaintiff also had a history of abuse as a child. (*Id.*)

### B. *Evidence Between May 25, 2005, Plaintiff's Alleged Onset Date, and December 31, 2005, Plaintiff's Last Insured Date*

A discharge summary by Dr. Merkin from JBFCS dated July 18, 2005, indicates that Plaintiff had regularly attended therapy sessions and medical visits. (A.R. at 136.) Plaintiff's treatment focused on depressive symptoms and anxiety caused by the failure of his business, his experiences related to September 11, 2001 and his plans to end his business. (*Id.*) Upon admission to treatment at JBFCS on October 16, 2003, Dr. Merkin diagnosed Plaintiff with major depressive disorder, recurrent. (*Id.* at 139.) A diagnosis of personality disorder was also made in October 2004. (*Id.*) Plaintiff reported that his anxiety had been significantly reduced early on by his medication regimen. (*Id.* at 136.) Dr. Merkin noted that Plaintiff had demonstrated some improvements over the course of his treatment; however, the recent loss of Plaintiff's apartment

and store, coupled with his move back to his mother's house, precipitated an increase in Plaintiff's depressive symptoms. (*Id.*) Plaintiff's attendance at JBFCS also decreased after his move. (*Id.*)

In July 2005, Plaintiff ceased treatment and indicated that he was planning to travel and visit friends for the remainder of the summer. (*Id.*) In the discharge summary, Plaintiff's overall treatment progress was reported as regression. (*Id.* at 137.) Dr. Merkin noted that Plaintiff was taking Zoloft (150 mg) and Ambien (10 mg). (*Id.*) At discharge, Plaintiff's "GAF" (Global Assessment of Functioning) score was 50[1]. (*Id.* at 139.) Dr. Merkin strongly recommended that Plaintiff seek a psychiatric appointment over the summer to prevent the interruption of his medication regimen. (*Id.* at 136.) On September 29, 2005, Plaintiff began treatment with his primary care physician, Dr. Khan, who saw Plaintiff every three to four months and ultimately diagnosed Plaintiff with anxiety and depression. (*Id.* at 173.)

C. *Evidence After December 31, 2005, Plaintiff's Last Insured Date*

   i. Dr. Kahn

The record includes treatment notes from Dr. Khan from February 10, 2007 through February 10, 2009. (A.R. at 301-16.) In a note dated June 12, 2007, Dr. Khan reported that Plaintiff had a "history of depression, anxiety disorder, [and] hypercholesterolemia." (*Id.* at 318.) Dr. Khan advised Plaintiff to see a psychiatrist. (*Id.*) In a report dated July 26, 2007, Dr. Kahn

---

[1] The clinician's judgment of an individual's overall level of functioning is represented by a Global Assessment of Functioning, or "GAF" score. (*See* Docket Entry No. 18, Plaintiff's Cross-Motion for Judgment on the Pleadings ("Pl. Mem.") at 7 (citing American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text rev. 2000) ("DSM-IV-TR")). The GAF score is taken from the GAF scale, which ranges from 100 to 1. (*Id.*) A higher GAF score represents a higher functioning ability. (*Id.*) The American Psychiatric Association classifies a person having a GAF score of 41-50 as having "'serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).'" (*Id.* (quoting American Psychiatric Ass'n at 34.))

4

reported that Plaintiff had chronic anxiety and depression. (*Id.* at 173.) Treatment consisted of Zoloft, Ambien and weekly psychotherapy. (*Id.* at 174.)

In a supplemental questionnaire dated February 10, 2009, Dr. Kahn reported that Plaintiff had a moderate degree of restriction of daily activities, deterioration in personal habits, and constriction of interests. (*Id.* at 320.) Dr. Kahn also wrote that Plaintiff had "moderate severe" limitations with respect to his ability to comprehend and follow instructions, perform work requiring frequent contact with others, and perform work where contact with others was minimal. (*Id.*) Similarly, Plaintiff experienced "moderate severe" impairments with respect to his ability to perform complex and varied tasks and full-time work in a routine work setting. (*Id.* at 321.) Plaintiff's ability to perform simple and repetitive tasks, however, was described as moderate. (*Id.* at 320-21.)

In addition, Dr. Khan completed a general medical report on March 26, 2009, in which he reported that Plaintiff was treated every three weeks and was diagnosed with depression, anxiety, chronic allergic rhinitis and hypercholesterolemia. (*Id.* at 349-51.) No clinical or laboratory findings were listed. (*Id.* at 350.)

    ii.  <u>JBFCB</u>

Almost two years after terminating his therapy sessions at JBFCB, Plaintiff returned on April 20, 2007 and was evaluated by Dr. Luft. (A.R. at 323-27.) On the date of his return, Dr. Luft diagnosed Plaintiff with various disorders including dysthymic disorder (begin date April 20, 2007), major depressive disorder (begin date October 16, 2003, end date April 20, 2007) and personality disorder (begin date October 14, 2004). (*Id.* at 325.) Plaintiff's GAF was 47. (*Id.*) At a July 2007 visit, Dr. Luft reported that Plaintiff's GAF had increased to 50. (*Id.* at 332.)

5

Dr. Luft reported that Plaintiff required continued therapeutic support and medication management as his symptoms had increased due to significant "life stressors." (*Id.* at 330.)

Dr. Luft also evaluated Plaintiff on August 7, 2007. (*Id.* at 246-54, 335-47.) Plaintiff reported that he still had sleep problems, felt depressed and was unable to get himself to move. (*Id.* at 335.) Dr. Luft wrote that Plaintiff was socially isolated and had no close friends. (*Id.* at 252.) Dr. Luft also noted that Plaintiff's symptoms had worsened in the past few months since he decided to restart his treatment at JBFCS, (*id.* at 252), but he appeared alert and oriented to person, time, place and situation. (*Id.* at 249). While no hallucinations, delusions or other misperceptions were experienced, Plaintiff was depressed and his concentration was impaired. (*Id.* at. 247-49.) Plaintiff's GAF was rated at 50. (*Id.* at 253.) Dr. Luft recommended Plaintiff attend individual weekly sessions to treat his depression and improve his level of motivation. (*Id.* at 250.)

Future treatment plan reviews from October 19, 2007 to January 18, 2008, showed that Plaintiff continued to reside with his mother and his overall treatment progress was minimal. (*Id.* at 255-68.) At Plaintiff's October 19, 2007 session with Dr. Hilsen, Plaintiff appeared not to be functioning at an optimal level socially or occupationally, thereby resulting in a GAF of 45. (*Id.* at 256.) At a January 3, 2008 session with psychiatrist Dr. Arking, Plaintiff was reported to be lethargic and socially isolated. (*Id.* at 217.) Plaintiff's GAF was 47. (*Id.* at 219.) According to Dr. Arking, Plaintiff did not appear to be able to adapt to changes in a work environment and engage in work related activities due to his severe depression. (*Id.* at 221-22.)

Between April 18, 2008 to March 19, 2009, Plaintiff attended sessions with Dr. Koyfman. (*See id.* at 269-96, 360-66.) Plaintiff remained depressed and had made minimal progress toward discharge criteria. (*See id.*) At an April 18, 2008 session, Dr. Koyfman noted that Plaintiff had

6

demonstrated traits of paranoid personality disorder. (*Id.* at 273.) Future sessions also revealed evidence of a schizoid personality disorder. (*Id.* at 277.) Plaintiff remained on Wellbutrin, Ambien and Zoloft. (*Id.*) Throughout the sessions from October 17, 2008 to March 19, 2009, Plaintiff's GAF remained at 47. (*See id.* at 284, 291, 360.)

Dr. Koyfman signed a medical source statement on March 19, 2009, which indicated that Plaintiff had moderate limitations in his ability to: (i) understand and remember simple instructions; (ii) carry out simple instructions; (iii) make judgments on both simple and complex work-related decisions; and (iv) understand and remember complex instructions. (*Id.* at 364-66.) Plaintiff also had moderate limitations interacting appropriately with the public, and responding appropriately to usual work situations. (*Id.* at 365.) Dr. Koyfman noted that Plaintiff had a history of working in solitude. (*Id.*)

## DISCUSSION

### I. Standard of Review

Unsuccessful claimants for disability benefits under the Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow. 42 U.S.C. §§ 405(g), 1383(c)(3). A district court, reviewing the final determination of the Commissioner, must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *See Schaal v. Apfel*, 134 F. 3d 496, 504 (2d Cir. 1998). The former determination requires the court to ask whether the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act. *Echevarria v. Sec'y of Health & Human Servs.,* 685 F. 2d 751, 755 (2d Cir. 1982) (internal quotations omitted). The latter determination

7

requires the court to ask whether the decision is supported by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

The district court is empowered to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. 42 U.S.C. § 405(g). A remand by the court for further proceedings is appropriate when the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the . . . regulations. *Manago v. Barnhart*, 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004). A remand to the Commissioner is also appropriate [w]here there are gaps in the administrative record. *Rosa v. Callahan*, 168 F. 3d 72, 83 (2d Cir. 1999) (quoting *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997)). ALJs, unlike judges, have a duty to affirmatively develop the record in light of the essentially non-adversarial nature of the benefits proceedings. *Tejada v. Apfel*, 167 F. 3d 770, 774 (2d Cir. 1999).

**II. Disability Claims**

To receive disability benefits, claimants must be disabled within the meaning of the Act. *See* 42 U.S.C. §§ 423(a), (d). Claimants establish disability status by demonstrating an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). The claimant bears the initial burden of proof on disability status and is required to demonstrate disability status by presenting medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, as well

as any other evidence the Commissioner may require. 42 U.S.C. § 423(d)(5)(A); *see also Carroll v. Sec'y of Health & Human Servs.*, 705 F. 2d 638, 642 (2d Cir. 1983).

ALJs must adhere to a five-step inquiry to determine whether a claimant is disabled under the Social Security Act as set forth in 20 C.F.R. §§ 404.1520 and 416.920. If at any step, the ALJ finds that the claimant is either disabled or not disabled, the inquiry ends there. First, the claimant is not disabled if he or she is working and performing substantial gainful activity. 20 C.F.R. §§ 404.1520(b); 416.920(b). Second, the ALJ considers whether the claimant has a severe impairment, without reference to age, education or work experience. Impairments are severe when they significantly limit a claimant's physical or mental ability to conduct basic work activities. 20 C.F.R. §§ 404.1520(c); 416.920(c). Third, the ALJ will find the claimant disabled if his or her impairment meets or equals an impairment listed in Appendix 1.[2] *See* 20 C.F.R. §§ 404.1520(d); 416.920(d).

If the claimant does not have a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity ("RFC") in steps four and five. 20 C.F.R. §§ 404.1520(e); 416.920(e). In the fourth step, the claimant is not disabled if he or she is able to perform past relevant work. 20 C.F.R. §§ 404.1520(e); 416.920(f). Finally, in the fifth step, the ALJ determines whether the claimant could adjust to other work existing in the national economy, considering factors such as age, education, and work experience. If so, the claimant is not disabled. 20 C.F.R. §§ 404.1520(f); 416.920(g). At this fifth step, the burden shifts to the Commissioner to demonstrate that the claimant could perform other work. *See Draegert v. Barnhart*, 311 F. 3d 468, 472 (2d Cir. 2002) (citing *Carroll*, 705 F. 2d at 642).

---

[2] 20 C.F.R. pt. 404, subpt. P, app. 1.

**III. ALJ's Decision**

The ALJ in the instant case followed the five-step procedure to determine whether Plaintiff is disabled. (*See* A.R. at 17-22.) The ALJ determined that the first and second requirements of disability were met because, from Plaintiff's alleged onset date of May 25, 2005 through Plaintiff's last insured date of December 31, 2005, Plaintiff did not engage in substantial gainful activity, and the combination of Plaintiff's depression and anxiety qualified as medically severe impairments. (*Id.* at 17.)

At step three, the ALJ determined that Plaintiff's mental impairments, individually and considered together, did not meet one of the listed impairments. (*Id.*) Specifically, the ALJ noted that Plaintiff is capable of feeding, bathing and dressing himself and, thus, only had a mild restriction in daily living activities. (*Id.*) After reviewing Plaintiff's hearing testimony, the ALJ concluded that Plaintiff's "admitted functioning is consistent with, at most, a moderate restriction in th[e] area [of social functioning]." (*Id.* at 18.) The ALJ found only mild to moderate difficulties with regard to Plaintiff's persistence or pace, and his ability to concentrate. (*Id.*) Plaintiff had not experienced any documented episodes of decompensation. (*Id.*) Accordingly, the ALJ found neither the "paragraph B" nor "paragraph C" criteria to have been satisfied. (*Id.*)

At step four, the ALJ concluded that Plaintiff had the RFC to perform a full range of work at all exertion levels from the onset date through the last insured date. (*Id.*) Due to Plaintiff's difficulty concentrating and communicating, particularly when drinking alcohol heavily, the only "nonexertional limitations" found by the ALJ were Plaintiff's limitations in "understanding[,] remembering and carrying out only simple instructions with only occasional interaction[s] with the general public, co-workers and supervisors." (*Id.*) However, most other times, particularly when

not under the influence of alcohol, Plaintiff was able to follow more detailed instructions. (*Id.* at 18-19.)

The ALJ determined that Plaintiff's depression and anxiety could reasonably cause Plaintiff's alleged "deficits in attention, concentration and memory, sleep difficulties, poor motivation and anxiety." (*Id.* at 19.) In addition, the ALJ concluded that Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms through the last insured date were not credible to the extent they were inconsistent with the ALJ's RFC assessment. (*Id.*) In particular, after reviewing the medical evidence from Plaintiff's first visit to JBFCS on October 16, 2003 to his discharge on July 18, 2005, the ALJ found that the objective medical evidence did not support Plaintiff's allegation of disability. (*Id.* at 19-20.) The ALJ emphasized that Plaintiff ceased treatment with JBFCS in July 2005 and did not return to JBFCS until almost two years later. (*See id.* at 20, 136, 323-24.) The ALJ also considered the medical evidence provided by Dr. Kahn, with whom Plaintiff commenced treatment in September 2005. (*See id.* at 20, 173.) The ALJ found that the "nature, extent, duration and frequency" of Plaintiff's treatment did not support his allegation of disability. (*Id.* at 20.)

The ALJ also found that Plaintiff's work history did not support his allegation of disability. (*Id.*) The ALJ relied on Plaintiff's function report, completed on April 3, 2007, and concluded that Plaintiff did not stop working because of his depression, anxiety or alcohol use. (*Id.*) Rather, the ALJ found that "the sole reason [] [Plaintiff] ceased working in June 2005 was because he and his partner closed the business due to the loss of customers." (*Id.*)

While the ALJ acknowledged that there were "several opinions of treating sources in the record," the ALJ disregarded these opinions, with the exception of Dr. Kahn's medical evidence, because they had not treated Plaintiff prior to 2007 and had not issued their opinion prior to

11

Plaintiff's last insured date. (*Id.*) Thus, they were not relevant to the issue of whether Plaintiff had been disabled on or prior to his last insured date. (*Id.*) In contrast, the ALJ considered the medical evidence provided by Dr. Kahn and found his opinion regarding Plaintiff's mental limitations to be consistent with the ALJ's findings that Plaintiff had the RFC to perform his past relevant work. (*Id.* at 20-21.) However, the ALJ found Dr. Kahn's medical evidence was not particularly relevant concerning Plaintiff's mental or physical condition prior to his last insured date, as his opinions were from 2007 through 2009. (*Id.*) The opinions by Dr. Kahn from February 2009 and March 2009, where Dr. Kahn noted that Plaintiff had moderate to severe limitations in all areas of mental functioning, were given only significant weight as of the date they were signed. (*Id.*)

The ALJ found that Plaintiff's testimony at the hearing supported the ALJ's conclusion that Plaintiff was not disabled prior to his last insured date. (*Id.*) Plaintiff admitted at this hearing that he drank heavily at work after September 11, 2011. (*Id.* at 38.) However, Plaintiff also asserted that his drinking did not impact the business, (*id.* at 41). The ALJ noted that "[t]hese assertions did not support the finding of a disability as much as they supported the idea that, whatever [Plaintiff's] limitations in December 2005 and earlier were, he continued to be able to do his old job through at least December 2005." (*Id.* at 21.) Thus, based on the evidence, the ALJ concluded that Plaintiff had the RFC to perform his past relevant work as co-owner and operator of a photocopy center through the last insured date. (*Id.* at 22.)

## IV. Analysis

### A. *Failure to Adequately Consider the Record*

Plaintiff claims that the ALJ's decision is not supported by the medical evidence. In particular, Plaintiff claims that the ALJ improperly ignored vital parts of the medical record,

12

namely: (i) the July 18, 2005 discharge summary by Dr. Merkin, where Plaintiff's GAF score was reported as 50; and (ii) medical evidence after Plaintiff's last insured date that is potentially relevant to the time period at issue. (*See* Pl. Mem. at 20-23.) In contrast, the Commissioner argues that the ALJ correctly found that Plaintiff was not disabled on or before his last insured date. (*See* Docket Entry No. 17, Memorandum of Law in Support of the Defendant's Motion for Judgment on the Pleadings ("Def. Mem.") at 19-24.)

      i.      The GAF score

Under 20 C.F.R. § 404.1520(3), the ALJ must "consider all evidence" in order to determine whether a claimant is disabled. In making this determination, "[i]t is not proper for the ALJ to simply pick and choose from the transcript only such evidence that supports his determination, without affording consideration to evidence supporting the plaintiff's claims." *Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 289 (E.D.N.Y. 2004); *see also Anderson v. Astrue*, 2009 WL 2824584, at *10-*11 (E.D.N.Y. Aug. 28, 2009) (holding that the ALJ improperly followed a "pick and choose approach" in evaluating evidence). Although, it is not the district court's role to weigh the credibility of complex, contradictory evidence, or reconsider anew whether the claimant is disabled, *see Schaal*, 134 F. 3d at 500-01, "it is the place of the district court to ensure that the ALJ has faithfully fulfilled his legal duties," *Sutherland*, 322 F. Supp. 2d at 289.

In this case, the ALJ reviewed the medical evidence from Plaintiff's first visit to JBFCS on October 16, 2003 to his discharge on July 18, 2005, and emphasized that Plaintiff ceased treatment with JBFCS in July 2005 and did not return to JBFCS until almost two years later. (*See id.* at 19-20; *see also id.* at 136, 323-24.) The ALJ also noted that Plaintiff had participated in weekly psychotherapy and monthly medication management until less than one month after his alleged onset date. (*Id.* at 20, 136.) The ALJ acknowledged that there were "several opinions of treating

13

sources in the record;" however, the ALJ disregarded these treating source opinions, with the exception of Dr. Kahn's medical evidence, because the treating physicians had not treated Plaintiff prior to 2007 and had not issued their opinion prior to Plaintiff's last insured date. (*Id*.) Based on this evidence, the ALJ concluded that "the nature, extent, duration and frequency of [] [Plaintiff's] treatment do not support his allegation of disability." (*Id.* at 20.) Notably, in reaching this decision, the ALJ failed to address Plaintiff's GAF score, which was 50 at discharge. (*See generally* A.R. at 15-22.) In fact, there is no mention of this score in the ALJ's decision. (*See id.* at 17-22.)

The GAF "ranks psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," and a GAF score of 50 "indicates that the individual has a serious impairment in one of the following: social, occupational, or school functioning." *Pollard v. Halter*, 377 F. 3d 183, 186 n.1 (2d Cir. 2004) (internal quotation marks omitted). This GAF score was reported in July 2005, which falls between Plaintiff's alleged onset date and last insured date. Thus, Plaintiff's GAF score of 50 might have been an important indicator of the extent of Plaintiff's mental limitations. In the discharge summary, Plaintiff's overall treatment progress was reported as regression by Dr. Merkin. (*Id.* at 137.) Without addressing this score in reaching his decision, "the Court is left to speculate whether all the circumstances of [Plaintiff's] claim were thoroughly analyzed, or instead were overlooked" by the ALJ. *Armstead v. Chater*, 892 F. Supp. 69, 76 (E.D.N.Y. 1995). This "pick and choose approach" is improper and undermines the Court's confidence in the ALJ's determination. *See Sutherland*, 322 F. Supp. 2d at 289; *Anderson*, 2009 WL 2824584 at *10-*11. While the ALJ is not allowed to rely on any test score alone, *see* 20 C.F.R. § 416.926a(e)(4)(i), in accordance with his duty under 20 C.F.R. § 404.1520(3), the ALJ

must consider the entire record. *Sutherland*, 322 F. Supp. 2d at 289. Thus, the ALJ should have considered and discussed the GAF score in his decision.[3]

Accordingly, remand is appropriate because the ALJ ignores parts of the record that are vital to the Plaintiff's disability claim. *See Lopez v. Sec'y of Dept. of Health and Human Services*, 728 F. 2d 148, 150-51 (2d Cir. 1984) ("We have remanded cases when it appears that the ALJ has failed to consider relevant and probative evidence which is available to him."); *see also Carnevale v. Gardner*, 393 F. 2d 889, 890-91 (2d Cir. 1968) (remanding where ALJ's decision did not reveal whether ALJ had considered certain important evidence in the transcript). The ALJ is instructed to consider Plaintiff's GAF score on remand.

    ii.    The Subsequent Medical Evidence after Plaintiff's Last Insured Date

In addition, under step four of the evaluation process, the ALJ acknowledged in his decision that there were "several opinions of treating sources in the record . . . ." (*See* A.R. at 20.) Only the opinion of Dr. Kahn, Plaintiff's medical doctor, was considered to be relevant to the issue of whether Plaintiff was disabled on or prior to the last insured date. (*Id.*) The opinions of the remaining treating sources were not issued prior to Plaintiff's last insured date, and none of the sources of these opinions, except Dr. Kahn, treated Plaintiff prior to 2007. (*See id.*) The ALJ disregarded these opinions. (*Id.*)

A disability must be established prior to Plaintiff's last insured date. *See Martinez v. Massanari*, 242 F. Supp. 2d 372, 376 (S.D.N.Y. 2003) (citing 42 U.S.C. §§ 423(a)(1)(A) and (D)). However, the Second Circuit has recognized that medical evidence obtained subsequent to

---

[3] Notably, although the Commissioner states that the ALJ need not consider the GAF score, he provides no support for that statement. (*See* Memorandum of Law in Further Support of Defendant's Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Cross-Motion for Judgment on the Pleadings ("Def. Reply") at 3.)

15

Plaintiff's last insured date "is not irrelevant to the question whether [Plaintiff] had been continuously disabled . . . ." *Arnone v. Bowen*, 882 F. 2d 34, 39 (2d Cir. 1989) (finding that medical evidence obtained before and after an applicant is insured for DIB can be used to show that the Plaintiff was disabled before the specified date, depending on the nature of the disability); *see also Guzman v. Bowen*, 801 F. 2d 273 (7th Cir. 1986) (finding that an IQ test taken after the Plaintiff was last insured for DIB was relevant to show that he was disabled during the relevant period). In fact, "[t]here is no rule rendering evidence obtained subsequent to the last insured date irrelevant *per se*." *Bender v. Astrue*, 2010 WL 5175023, at *6 (N.D.N.Y. Nov. 29, 2010). To the contrary, the Second Circuit has recognized that:

> Evidence bearing upon an applicant's condition subsequent to the [last insured date] . . . is pertinent evidence in that it may disclose the severity and continuity of impairments existing before the earning requirement date or may identify additional impairments which could reasonably be presumed to have been present and to have imposed limitations as of the earning requirement date.

*Lisa v. Sec'y of Dept. of Health & Human Servs.,* 940 F. 2d 40, 44 (2d Cir. 1991) (citations omitted); *see also Pollard*, 377 F. 3d at 194 (finding that "district court erred insofar as it categorically refused to consider [certain] evidence" simply because it was generated after the relevant time period and "did not explicitly discuss [the claimant's] condition during the relevant time period").

In the instant case, Plaintiff returned to JBFCB on April 20, 2007, almost two years after terminating his therapy sessions. (A.R. at 323-27.) At this visit, Plaintiff's GAF was reported to be 47. (*Id.* at 325) The medical evidence from Plaintiff's treatment with JBFCS from 2007 to 2009 indicates that Plaintiff still had problems with depression, and Plaintiff's GAF score fluctuated between 45 and 50, (*see id.* at 219, 221, 253, 256, 269-96, 332, 360-66; *see also id.* at 255-96, 322-47), which signifies that he had a "serious impairment in one of the following: social,

16

occupational, or school functioning," *see Pollard*, 377 F. 3d at 186 n. 1 (internal quotation marks omitted). The JBFCS records could be relevant because they might demonstrate a continuity of symptoms between Dr. Merkin's July 2005 discharge summary and his condition in 2007. (*See* Pl. Mem. at 22.) When Plaintiff resumed treatment in 2007, the mental health professionals reached similar conclusions to those reached by Dr. Merkin in 2005. (*See id.* at 21; A.R. 252-54.) Accordingly, the ALJ should not have rejected the psychiatric evidence discussed above simply because they were after Plaintiff's last insured date. Even the possibility that these medical findings by the psychiatrists at JBFCS might demonstrate a continuity of Plaintiff's mental limitations "obligates[s] the ALJ to explore the possibility that the diagnoses applied retrospectively to the insured period." *See Martinez*, 242 F. Supp. 2d at 378. Thus, the ALJ erred in failing to pursue and consider the possibility of retrospective diagnosis based on these subsequent medical findings.

Accordingly, remand is required for further development of the record and consideration of this psychiatric evidence from JBFCS from 2007-2009. *See Bender*, 2010 WL 5175023, at *7; *Pollard*, 377 F. 3d at 194; *Lisa,* 940 F. 2d at 44.

### B. *The ALJ's Conclusion Regarding Plaintiff's Alcohol Consumption*

Plaintiff also argues that the ALJ incorrectly concluded that Plaintiff's psychiatric problems were caused or exacerbated by alcohol abuse. (*See* Pl. Mem. at 23-25.) However, the ALJ did not make such a conclusion. Rather, under step three of the evaluation process, the ALJ found Plaintiff's heavy drinking was consistent with, at most, moderate difficulty in the area of concentration. (*Id.* at 18.) In addition, under steps four and five, the ALJ concluded that when Plaintiff drank alcohol heavily, he was "limited, intermittently, to understanding[,] remembering and carrying out only simple instructions with only occasional interaction with the general public,

co-workers and supervisors." (*Id.*) The ALJ found that on most other occasions, when not under the influence of alcohol, Plaintiff was able to follow more detailed instructions. (*Id.* at 18-19.) In reaching these determinations, the ALJ considered both Plaintiff's medical evidence and work history. The ALJ also relied on Plaintiff's hearing testimony where he had stated that his drinking did not impact his work. (*Id.* at 20, 41.) Thus, there is no reversible error with regard to the ALJ's assessment of this issue.

## **CONCLUSION**

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is denied and plaintiff's motion is granted. Accordingly, this case is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this opinion.

SO ORDERED.

Dated: Brooklyn, New York
      February 1, 2012

/s/
DORA L. IRIZARRY
United States District Judge